## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF RIVIERA BEACH POLICE OFFICERS' PENSION FUND, on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>                    v.<br><br>BANK OF AMERICA, N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; BANK OF AMERICA MERRILL LYNCH INTERNATIONAL LTD.; CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE INTERNATIONAL; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; NOMURA INTERNATIONAL PLC; NOMURA SECURITIES INTERNATIONAL, INC.; HIREN GUDKA; AMANDEEP SINGH MANKU; SHAILEN PAU; and BHARDEEP SINGH HEER,<br><br>                    Defendants. | **Case No.: 16-cv-9398**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff City of Riviera Beach Police Officers' Pension Fund (here, "Plaintiff"), individually and on behalf of all others similarly situated, as defined below, brings this class action for violation of the Sherman Act, 15 U.S.C. § 1, arising from Defendants' conspiracy to fix the prices of supra-national, sub-sovereign, and agency bonds (collectively referred to in this Complaint as "SSA bonds") bought or sold in the secondary market by Plaintiff and other similarly-situated investors.

## NATURE OF THE ACTION

2.      This class action stems from Defendants' conspiracy to artificially inflate the prices investors paid for SSA bonds and to artificially lower the prices for which they sold SSA bonds in transactions with Defendants. Plaintiff brings this action on behalf of itself and a proposed Class of all persons or entities who, from at least as early as January 1, 2011 through at least December 31, 2014 (the "Class Period"), bought or sold SSA bonds.

3.      Governments and instrumentalities of governments issue bonds as a way of borrowing money.  There are three general types of SSA bonds: (1) "supra-national" bonds, which are issued by entities that are created by one or more sovereign governments, or by stakeholders from several different countries, such as the World Bank; (2) "sub-sovereign" bonds, which are issued by entities like local governments (*e.g.*, Canadian provinces or states in the German federation, known as "länder"); and (3) "agency" bonds, which are issued by government-sponsored entities (known as "GSEs") or agencies, which in the United States includes the Federal Home Loan Mortgage Association (Freddie Mac) and the Federal Home Loan Mortgage Association (Fannie Mae), social security funds, highway and bridge authorities, utilities, and public transportation entities.

4.      There is no central exchange for buying or selling SSA bonds, which must be bought or sold "over-the-counter," where investors, like Plaintiff, transact with a dealer as the counter-party to the transaction.  Plaintiff and other investors looking to invest in agency bonds have to do so on the so-called "secondary market," which is the trading market that exists to buy and sell the bonds after they are initially issued.  Banks, like the Bank Defendants (as defined below) here, are "market-makers" for SSA bonds, buying or selling the bonds directly in transactions with investors like Plaintiff and members of the proposed class.

5.      Competition among dealers for investors is based on the "bid-ask spread," which is the difference between the prices at which a dealer would buy (the "bid") or sell (the "ask") the bond.  Customers looking to buy or sell an SSA bond will ask the dealer, or potentially a range of dealers, what their "bid-ask spread" is for that particular security.  The spread is the dealer's revenue on the transaction, and the "tighter," or narrower, the spread, the more competitive the dealer's price is to the investor.

6.      Yet instead of competing with each other by narrowing or "tightening" their bid-ask spreads, the Defendants conspired, to the detriment of Plaintiff and the proposed class, to artificially inflate their spreads, boosting their own profits at the expense of Plaintiff and other investors.

7.      Starting in approximately 2011, the Defendants named below participated in illegal, conspiratorial discussions about their customers, trading patterns, specific trades and spreads, intending to, and in fact did, fix the bid-ask spreads quoted to investors seeking to buy or sell SSA bonds on the secondary market.  The Bond Trader Defendants (as defined below) communicated with each other in person and over the phone, but their primary methods of enacting their conspiracy was online, using private dealer-to-dealer chatrooms, instant-messaging systems, and

e-mail.  SSA bond traders often communicate with each other in Bloomberg chatrooms, and, according to an insider quoted in a press article, "created a new chatroom each day to discuss activity and prices."[1]

8.       Government regulators, including the United States Department of Justice ("DOJ") discovered the Defendants' scheme in late 2015, when Bloomberg reported that the DOJ had begun a criminal probe focusing on "possible manipulation in the trading of agency bonds,"[2] with the article further reporting that the federal government had obtained transcripts of dealers' chatroom conversations that may include evidence of improper communications and other wrongdoing.  In early 2016, about a month after news of the DOJ's investigation first broke, industry press began reporting on similar investigations of the Bank Defendants and the Bond Trader Defendants being conducted by both the European Commission ("EC") and the United Kingdom's Financial Conduct Authority ("FCA," who, according to one article, may be coordinating their investigation with the DOJ) for alleged collusive activities in the SSA bond market.[3]  Within weeks of the news of the European investigations, all four of the Bond Trader Defendants had been removed from their trading desks pending the outcome of the investigations.[4]

---

[1] Abhrinav Ramnarayan &Helene Durand, *EXCLUSIVE- DoJ investigates bond traders over market-rigging*, Int'l Financing Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.fullarticle.

[2] David McLaughlin & Tom Schoenberg, *U.S. Said to Probe Possible Rigging in Agency Bond Market*, Bloomberg (Dec. 9, 2015), www.bloomberg.com/news/articles/2015-12-09/u-s-said-to-probe-possible-rigging-in-agency-bond-market.

[3] Craig McGlashan, Owen Sanderson, Ralph Sinclair, & Toby Fildes, *Scandal rocks SSA market*, GlobalCapital, (Jan. 7, 2016), www.globalcapital.com/article/vydmn22frhms/trading-scandal-rocks-ssa-market; Aoife White & Suzi Ring, *EU Said to Investigate Possible Rigging of Agency-Bonds*, Bloomberg (Feb. 10, 2016), www.bloomberg.com/news/articles/2016-02-10/eu-said-to-investigate-possible-rigging-of-agency-bond-market.   Gina Chon, Caroline Binham, & Laura Noonan, *DoJ investigates traders over debt-market rigging*, Financial Times (Jan. 6, 2016).

[4] *Id.*

9.      The *modus operandi* adopted by the Defendants here and the focus of global regulatory probes – dealers regularly and secretly using electronic chat rooms, instant-messaging and other methods to fix or manipulate prices or rates for securities – is exactly the type of conduct that has resulted in a wave of governmental investigations about how groups of large, global banks (including some of the Defendants in this case) have manipulated various financial benchmarks (such as LIBOR and ISDAfix, detailed below) and the pricing of investment products (such as trading in the foreign-exchange market and the market for U.S. Treasury securities).   These investigations – many of which have resulted in the targeted banks paying fines collectively amounting to billions of dollars – have all revealed a pattern of regular, frequent, conspiratorial communications between dealers via online chat rooms, instant messaging, and email.

10.      As a result of Defendants' conspiracy, Plaintiff and the proposed Class paid inflated prices for their SSA bond trades. By inflating their bid-ask spreads, Defendants charged Plaintiff and the proposed Class more for their SSA purchases, and paid them less for their SSA sales, than the prices that would have prevailed in a competitive market.

11.      Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief, and the investigation of Plaintiff's counsel and its economic consultant, as to all other matters. Except as alleged here, Plaintiff and other members of the proposed Class currently lack access to all of the underlying facts relating to Defendants' anticompetitive behavior. Rather, this information is exclusively possessed and controlled by the Defendants and other insiders, which prevents Plaintiff from further detailing Defendants' misconduct. Moreover, the pending global regulatory investigations by the DOJ, FCA, and EC of Defendants' SSA bond price manipulation could yield information from Defendants' internal records or personnel that bears significantly on Plaintiff's and the Class's claims. Plaintiff thus

believes that further evidentiary support for its allegations will come to light after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

13.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the Class Period, all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

14.     This Court has personal jurisdiction over Defendants pursuant to the nationwide contacts test provided for in 15 U.S.C. § 22, because Defendants, as set forth below, were formed in, have their principal places of business in, have locations in, or have substantial contacts with the United States in general and this District specifically. In addition, this Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States, including in this District; bought and sold SSA bonds throughout the United States, including in this District; had substantial contacts with the United States, including in this District; committed overt acts in furtherance of their conspiracy in the United States. In addition, Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

15.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## PARTIES

16.     Plaintiff City of Riviera Beach Police Officers' Pension Fund is a pension plan located in Riviera Beach, Florida.  During the Class Period, Plaintiff purchased or sold one or more U.S.-dollar-denominated SSA bonds, and was harmed as a consequence of Defendants' unlawful conduct.

17.     **Bank of America.** Defendant Bank of America, N.A. is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina.

18.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

19.     Defendant Bank of America Merrill Lynch International Ltd. is a subsidiary of Bank of America, N.A., with its principal place of business located in London, England.

20.     Defendants Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Inc., Bank of America Merrill Lynch Int'l Ltd., and their parents, subsidiaries, and affiliates are referenced collectively in this Complaint as "Bank of America." During the Class Period, Bank of America purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During a portion of the Class Period, Bank of America employed Bond Trader Defendants Amandeep Singh Manku and Hiren Gudka, both of whom are SSA bond traders under investigation by the DOJ.  Bond Trader Defendant Manku was also employed by Defendant Crédit Agricole during another portion of the Class Period, and Bond Trader Defendant Gudka was also employed by Defendant Deutsche Bank during another portion of the Class Period.

21.     **Crédit Agricole.** Defendant Crédit Agricole Corporate and Investment Bank is a bank organized and existing under the laws of France with its principal place of business in Paris, France, and with branch locations in New York, New York.

22.     Defendant Crédit Agricole Corporate and Investment Bank and its parents, subsidiaries, and affiliates are referenced collectively in this Complaint as "Crédit Agricole." During the Class Period, Crédit Agricole purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During a portion of the Class Period, Crédit Agricole employed Bond Trader Defendants Amandeep Singh Manku and Shailen Pau, both of whom are SSA bond traders under investigation by the DOJ.   Bond Trader Defendant Manku was also employed by Defendant Bank of America during another portion of the Class Period, and Bond Trader Defendant Pau was also employed by Defendant Credit Suisse during another portion of the Class Period.

23.     **Credit Suisse.** Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.

24.     Defendant Credit Suisse AG is a wholly owned subsidiary of Credit Suisse Group AG and is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Credit Suisse AG is licensed by the New York Department of Financial Services and operates a branch registered in New York, New York.

25.     Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse Group AG.

26.     Defendant Credit Suisse International is a wholly owned subsidiary of Credit Suisse Group AG with its principal place of business in London, England.

27.        Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse International, and their parents, subsidiaries, and affiliates are referenced collectively in this Complaint as "Credit Suisse." During the Class Period, Credit Suisse purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During a portion of the Class Period, Credit Suisse employed Defendant Shailen Pau, an SSA bond trader who is under investigation by the DOJ, who for another portion of the Class Period was also employed by Defendant Crédit Agricole.

28.        **Deutsche Bank.** Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. Deutsche Bank AG is licensed by the New York Department of Financial Services with a registered address in New York, New York.

29.        Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of Deutsche Bank AG.

30.        Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., and their parents, subsidiaries, and affiliates are referenced collectively in this Complaint as "Deutsche Bank." During the Class Period, Deutsche Bank purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During a portion of the Class Period, Deutsche Bank employed Defendant Hiren Gudka, who for another portion of the Class Period was also employed by Defendant Bank of America.

31.        **Nomura.** Defendant Nomura Securities International, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

32.     Defendant Nomura International plc is a financial services company with its principal place of business in London, England.

33.     Defendants Nomura Securities International, Inc., Nomura International plc., and their subsidiaries and affiliates are referenced collectively in this Complaint as "Nomura." During the Class Period, Nomura purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During the Class Period, Nomura employed Defendant Bhardeep Singh Heer, an SSA bond trader under investigation by the DOJ.

34.     **Hiren Gudka.** Defendant Hiren Gudka ("Gudka") is an individual residing in Middlesex, England. During the Class Period, Gudka purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During the Class Period, Gudka was an SSA bond trader employed by Defendants Bank of America and, previously, Deutsche Bank.  Upon information and belief, Gudka was terminated by Bank of America as a result of the SSA investigation.

35.     **Amandeep Singh Manku.** Defendant Amandeep Singh Manku ("Manku") is an individual residing in Essex, England. During the Class Period, Manku purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During the Class Period, Manku was an SSA bond trader employed by Bank of America and Crédit Agricole.  Upon information and belief, Manku was terminated by Crédit Agricole as a result of the SSA investigation.

36.     **Shailen Pau.** Defendant Shailen Pau ("Pau") is an individual residing in London, England. During the Class Period, Pau purchased and sold SSA bond to members of the Class. During the Class Period, Pau was an SSA bond trader employed by Credit Suisse and Crédit Agricole.

37.     **Bhardeep Singh Heer.** Defendant Bhardeep Singh Heer ("Heer") is an individual residing in Essex, England. During the Class Period, Heer purchased SSA bonds from and sold SSA bonds to members of the Class in the United States. During the Class Period, Heer was an SSA bond trader employed by Nomura.

38.     Defendants Bank of America, Crédit Agricole, Credit Suisse, Deutsche Bank, and Nomura are referenced collectively in this Complaint as the "Bank Defendants." Defendants Gudka, Manku, Pau, and Heer are referenced collectively in this Complaint as the "Bond Trader Defendants."

39.     **Other conspirators.** Various other entities, persons, firms, and corporations, that are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

## FACTUAL ALLEGATIONS

### I.     THE SSA BOND MARKET

40.     SSA bonds are issued by different kinds of public entities in the United States and overseas.  The SSA sector of the overall bond market includes supranational, sub-sovereign, and agency issuers.  Supranational issuers are entities created by multiple sovereign governments or stakeholders from several countries to accomplish social or economic goals affecting numerous countries; examples of such entities that have issued SSA bonds during the Class Period include the World Bank's International Finance Corporation ("IFC"), the African and Asian Development Banks ("AfDB" and "ADB"), the European Investment Bank ("EIB"), and the European Bank for Reconstruction and Development ("EBRD").  Sub-sovereign issuers include Canadian provinces

and German "länder."  <u>Agency</u> (or "<u>GSE</u>") issuers include Fannie Mae and Freddie Mac in the United States, the Kreditanstalt für Wiederaufbau ("KfW") in Germany, the Caisse d'Amortissement de la Dette Sociale ("CADES") in France, the Instituto de Credito Oficial ("ICO") in Spain, and the Bank Nederlandse Gemeenten N.V ("BNG") in Holland.

41.    International issuers, including certain Canadian provinces, the KfW and the EIB, occasionally issue debt in currencies different from their local currency, including U.S. dollars, to take advantage of potentially lower funding costs, to reach a broader pool of potential investors, and to lessen volatility in their local currencies.

42.    The overall size of the SSA market has been estimated to range from roughly $9 trillion to about $15 trillion,[5] with U.S.-dollar denominated SSA bonds – which are especially attractive to investors because they offer higher yields than U.S. Treasury bonds while still offering a high-quality risk profile – making up slightly over one-third of all SSAs issued globally.[6]  The market for SSA bonds is a niche market in the overall bond market, occupying the space between "sovereign" bonds issued by national governments (such as U.S. Treasuries) and private or corporate debt (*i.e.*, debt issued by corporations to finance acquisitions or operations).

43.    Somewhat like pure "sovereign" bonds, SSA bonds are typically viewed as highly secure investments, both because the issuers are generally well-capitalized and because the bonds are typically backed by guarantees of repayment (sometimes explicit and sometimes implicit) by the governments associated with the entities issuing the bonds.   The entities that invest in SSA

---

[5] McLaughlin & Schoenberg, *supra*.
[6] Ken Miller, "The SSA Market: a Legitimate 'Safe Spread Alternative?'", PIMCO Featured Solution (Nov. 2012),  <u>www.pimco.com/insights/investment-strategies/featured-solutions/the-ssa-market-a-legitimate-safe-spread-alternative</u>.

bonds are primarily central banks, insurance and pension plans (such as Plaintiff), and private banks.[7]

### The Mechanics of SSA Issuance in the "Primary" Market and the Trading of SSA Bonds in the "Secondary" Market

44.     SSA bonds are issued in a "syndication" process, whereby a potential issuer contracts with a bank (or, more typically, a group of banks) to underwrite the bond and also sell the bonds to investors such as Plaintiff and members of the proposed Class.   In a process called "underwriting," these banks are tasked with creating a market for the bonds that they underwrite, a task which involves gauging investor demand for these securities and the price at which they can be sold, and ultimately, selling the bonds to the public.

45.     After the SSA bonds are initially issued, investors can buy or sell SSA bonds in the "secondary" market.  Because there is no public exchange for SSA bonds, investors trade SSA bonds "over-the-counter" (sometimes referred to as the "OTC" market) – that is, directly with a dealer as a counter-party.  In the OTC market, bond dealers act as "market-makers," which is an entity that is willing to quote a price to buy or sell a bond at any given time, even if the market maker does not have another buyer lined up.  The market-maker therefore stakes its own capital to provide investors with liquidity (*i.e.*, volume in or inventory of the given bond).

46.     More often than not, the banks that underwrite an issuer's initial bond issuance are also acting as market-makers for the same SSA bonds in the secondary market.  Among the factors that dictate issuers' choices in selecting underwriting banks are those banks' ability to provide liquidity (*i.e.*, volume or inventory) in the "secondary" market.  How SSA bonds perform in the "secondary" market is important to the entities issuing the bonds, because the liquidity of their

---

[7] George Richardson, Flora Chao, & Laura Fan, Government Investment Officers Association (GIOA) Conference, "Supranationals", at 20-21 (March 2015), http://www.gioa.us/presentations/2015/15-Richardson_World_Bank_Supras.pdf.

existing bonds is likely to affect the price of the bonds they will issue on the "primary" market in the future.   In addition to buying and selling bonds with investors, market-makers also trade bonds with each other to try and balance their inventories and manage the overall risk of their portfolios.

47.     Dealers make their profits on the difference between the "bid" and "ask" prices offered by the dealer, and the difference between the two prices is called the "bid-ask spread." There is a risk that the bonds a given dealer buys and holds in its inventory will decline in value before the bond dealer finds a willing buyer, and the "bid-ask spread" is meant to compensate the dealer for that risk.  "Bid-ask spreads" are the main point of competition among the market-making banks that sell SSA bonds to investors.

48.     When an investor wants to buy or sell an SSA bond, it will solicit a quote from a dealer; the dealer's quote is that dealer's "bid-ask spread" for that particular bond.    Potential customers looking to buy or sell SSA bonds want a "bid-ask spread" that is as narrow as possible (that is, the customer wants to be able to buy bonds for less and be able to sell them for more).  By quoting narrower "bid-ask spreads," the Defendants compete by winning sales, gaining customers, and increasing their market share.  Conversely, a Defendant quoting a "wider" spread risks losing customers to its ostensible competitors, because a customer is looking for the narrowest available "bid-ask spread" in the OTC market.

49.     SSA trades are executed by customers via telephone and, more prevalently in the last decade, via electronic means, either through electronic messages to traders at a dealer-bank, or through dealer-to-client electronic trading platforms.[8]  Regardless of how customers undertake

---

[8] A dealer-to-client electronic trading platform is a computer system that customers can use to execute orders with dealers over a network. Examples of electronic trading platforms used for trading SSA bonds include MarketAxess, TradeWeb, Bloomberg BondTrader, and MTS Bondvision.

their transactions, the process is essentially the same: a potential customer seeks and requests a quote from one or more dealers, who in turn give the potential customer a "bid-ask" quote for the given security.

## II.   DEFENDANTS CONSPIRE TO FIX THE PRICES OF SSA BONDS SOLD TO OR BOUGHT FROM PLAINTIFF AND MEMBERS OF THE PROPOSED CLASS

50.     Starting at least as early as 2011, Defendants conspired to fix the prices of SSA bonds on the "secondary" market – that is, to both (a) <u>raise</u> the prices secondary-market investors <u>paid</u> for SSA bonds and (b) <u>decrease</u> the prices at which investors <u>sold</u> the bonds.

51.     The Bond Trader Defendants regularly used online chatrooms to communicate with each other and to effect the conspiracy alleged here.  Following high-profile scandals involving the financial markets (like the foreign-exchange and LIBOR probes), in addition to using e-mails, in-person meetings and instant-messaging, the Bond Trader Defendants began using private chatrooms to further mask their communications, and went to great lengths to hide their conversations, even, according to a report in a financial journal, creating new chatrooms each day for the purpose of discussing their trading activity and prices.[9]  As part of its ongoing investigation, the DOJ has obtained transcripts of these chatroom communications that indicate potential misconduct, and as part of its inquiry, has asked the Bank Defendants to further investigate the behavior uncovered by the chatroom transcripts.[10]

52.     Defendants' traders regularly shared confidential client information about the orders that customers were placing with the Defendants' sales desks.  Because most of the Defendants have a group of regular customers with predictable, large SSA bond transactions,

---

[9] Ramnarayan & Durand, *supra*.
[10] Suzi Ring and Tom Schoenberg, *U.K. Said to Open Probe Into Rigging of Agency-Bonds Market*, Bloomberg (Jan. 20, 2016), www.bloomberg.com/news/articles/2016-01-20/agency-bond-rigging-probe-said-to-expand-as-u-k-opens-inquiry-ijmri0ov.

foreknowledge of other traders' client portfolios and trading patterns allowed the Defendants to conspire on trading strategies, including "bid-ask spreads" specifically.  After getting customers' requests for quotes, the Defendants shared specific bond and volume information with their competitors – a practice that is anathema to a truly competitive market where such competitively-sensitive information is closely-guarded.

53.     Defendants then agreed with each other on who would offer price quotes to potential buyers and sellers of bonds. As part of these conversations, some Defendants agreed to withhold offering quotes to customers on certain SSA bonds – and in the process, inhibited their customers' ability to "shop around" for better prices.

54.     Besides conspiring on who would offer prices, Defendants also colluded on the "bid-ask spreads" that were offered to customers. Defendants agreed that they would offer the same or substantially similar spreads to potential buyers and sellers of SSA bonds. The "bid-ask spreads" that were quoted to customers were, as a result of these collusive agreements, artificially inflated – in other words, Defendants quoted artificially <u>high</u> "asks" on certain bonds and artificially <u>low</u> "bids" on those same bonds in order to maximize their spreads to the detriment of the Class.  According to one SSA bond trader quoted in a financial journal article describing the method of the alleged conspiracy, "if you can speak to another trader and agree to sell a bond at a certain price and not below, then that makes a big difference."[11]

55.     Absent an agreement to fix bid and ask prices, no one Defendant could afford to unilaterally widen its "bid-ask spread;" doing so could result in that Defendant losing substantial trading business to competitors who were offering more competitive pricing.  Moreover, that loss

---

[11] Ramnarayan & Durand, *supra*.

could jeopardize a Defendant's ability to secure future underwriting business from SSA bond issuers.

56.     The market for SSA bonds is a concentrated one.  Defendants' conspiracy was more likely to succeed due to the relatively small number of players in the industry, coupled with repeated interactions between the same traders on specific buy-sell transactions, as well as repeated interactions between the same banks on syndication deals. SSA bonds are generally regarded as a niche market, with a limited number of banks offering to serve as "market-makers" for a given bond. In addition, those dealer banks may transact with each other in that bond in order to mitigate or balance their risk. As a result, the dealers at some  bond trading desks had repeated and ongoing business relationships, even though they are ostensibly supposed to act as competitors in trying to attract trading customers.  In addition, there is a chummy, collegial atmosphere pervasive in the industry, aided by longtime and ongoing relationships between banks in the "secondary" market as well as the intertwined and symbiotic relationships between the trading desks and underwriting groups (which rely on the traders for information about the secondary market to compete for issuers) within the banks themselves.  Indeed, an industry source was quoted by Bloomberg acknowledging that "[g]iven the collegial nature [within the industry], people might talk about things that they shouldn't."[12]

57.     With no public insight into order flow or "bid-ask spreads," the Defendants' possession of proprietary, competitively-sensitive client, trading and volume information helped

---

[12] Craig McGlashan, et al., *'Forced competition' to generate trading flow under fire for fomenting SSA scandal*, Global Capital (Jan. 7, 2016), www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal.

their conspiracy succeed, as Defendants' knowledge of their clients' portfolios enabled Defendants to better plan their trading strategies with those customers and set "bid-ask spreads."

58.      In addition, the paucity of regulatory oversight over the SSA bond "secondary" market also enabled Defendants' conspiracy – unlike a highly-regulated public exchange like the NYSE or Nasdaq, the "secondary" market for SSA bonds is an international, predominantly electronically-operated, "over-the-counter" market that lacks uniform regulation and regulatory oversight of pricing.

## III.   AT LEAST THREE GOVERNMENT REGULATORS LAUNCH INVESTIGATIONS INTO DEFENDANTS' COLLUSIVE CONDUCT IN THE SSA BOND SECONDARY MARKET

59.      Defendants' illegal activities first came to light on December 9, 2015, when Bloomberg[13] reported that the U.S. Department of Justice had begun a preliminary investigation into collusive conduct in the market for SSA bonds. A January 6, 2016 article in *International Financing Review*[14] added more details, including the names of the four London-based traders (the Bond Trader Defendants) and four banks (the Bank Defendants) under investigation. A January 7, 2016 article in GlobalCapital stated that the DOJ and the FCA were working together on the investigation.[15]

---

[13] McLaughlin & Schoenberg, *supra*.
[14] Ramnarayan & Durand, *supra*.
[15] McGlashan, Sanderson, et al., *supra*.

17

60.     Moreover, Defendants Crédit Agricole[16] and Deutsche Bank[17] have stated in their financial disclosures that they are cooperating with unspecified regulators or law enforcement agencies in their requests for information pertaining to the SSA bond market.

61.     In light of the investigations, all four Bank Defendants removed the Bond Trader Defendants from their trading desks. Defendants Gudka and Manku left their employers in November and December, 2014, respectively, and have been inactive on the FCA's register for traders since December 2015. Defendants Pau and Heer have been inactive on the FCA register since March 2016.

## IV.    DEFENDANTS' COLLUSION IN THE SSA BOND SECONDARY MARKET IS THE LATEST EXAMPLE OF SIMILAR WRONGDOING INVOLVING OTHER FINANCIAL PRODUCTS

62.     The misconduct under investigation in the "secondary" market for SSA bonds is very similar to collusion in other financial products (some of which involve the same Defendants here) that has been uncovered by numerous governmental investigations in the United States and Europe.

63.     In June 2015, various news publications reported that the DOJ had initiated an investigation into possible fraudulent manipulation of the $12.7 trillion Treasury market. As part of its investigation, the DOJ reportedly sent requests for information to many of the Defendants, who are also heavily involved in trading U.S. Treasury Securities. The DOJ's investigation is not an isolated one. Rather, it is the another inquiry into the manipulation of financial markets and benchmarks by major banks, many of which are the Defendants in this action.  As Professor Jill E.

---

[16] Crédit Agricole Group, Annual Financial Report 2015 Registration Document, at 261, www.credit-agricole.com/en/Investor-and-shareholder/Financial-reporting/Credit-Agricole-S.A.-financial-results.
[17] Deutsche Bank, Interim Report as of March 31, 2016, at 114, www.db.com/ir/en/download/DB_Interim_Report_1Q2016.pdf.

Fisch of the Institute for Law and Economics at the University of Pennsylvania Law School observed in a *Bloomberg* Business article, "[i]t's not just one investigation after another, it's one scandal after another."[18]

64.     In March 2011, government regulators and prosecutors from around the world accused many of the same Defendants named in this Complaint of manipulating LIBOR (*i.e.*, the London Interbank Offered Rate, used by major lenders around the world to set their own interest rates). Since then, government investigations have been ongoing in the United States, United Kingdom, Switzerland, the European Union, Japan, Canada, and Singapore. In the U.S., the DOJ, the Commodity Futures Trading Commission ("CFTC"), and the Securities and Exchange Commission have ongoing parallel investigations. Regulators accused the banks of manipulating LIBOR rates by coordinating submissions and submitting deliberately false quotes for various LIBOR rates to the British Bankers' Association, the organization that collected dealer-bank submissions and calculated the various LIBOR rates. To date, the LIBOR investigations, which revealed evidence of widespread manipulation of LIBOR through private electronic chatrooms, have resulted in guilty pleas and fines in the billions of dollars, including on behalf of certain Defendants or their parent companies. The banks that have been fined thus far include Deutsche Bank, which, in 2012, was one of several banks which entered into non-prosecution agreements, barring them from committing crimes in the U.S. for two years.

65.     Subsequent U.S. and foreign investigations into the foreign exchange ("FX") markets revealed similar collusions among a similar group of banks to manipulate financial benchmarks and markets by using closed network chatrooms with incriminating names, such as

---

[18] Keri Geiger & Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG (June 10, 2015), http://www.bloomberg.com/news/articles/2015-06-10/treasuries-collusion-said-to-be-hunted-in-next-wave-of-probes.

"The Cartel," "The Bandits Club," and "The Mafia" to coordinate trades and positions. Despite these significant fines and penalties, regulators' subsequent investigations revealed continued collusion by some of the Bank Defendants (including Bank of America and Nomura), to manipulate the ISDAfix benchmark (the pricing benchmark for the fixed rate portion of interest rate swaps), including communications between banks' trading desks and with third party brokers to request that artificial pressure be exerted on the ISDAfix at specific times to benefit one trading party at the expense of its counterparty. In conjunction with the CFTC's investigation of the ISDAfix conspiracy, the CFTC found that the banks used various code words to communicate with each other. In connection with the CFTC investigation of ISDAfix, the CFTC released an email indicating that traders used U.S. Treasury Securities as part of their scheme to manipulate and influence ISDAfix.

66.     The investigations into collusive activities in the SSA bond market are simply the latest in an ongoing wave of revelations about corruption in the financial services industry. With each passing scandal, it becomes clear that these are not isolated events, but rather that "cross-talk" on electronic platforms, to arrange manipulative trading strategies at key points in the day, was for years viewed as normal operating procedure by Defendants and others in the banking industry.

## V.     DEFENDANTS' CONSPIRACY INJURED PLAINTIFF AND THE PROPOSED CLASS

67.     As a direct and proximate result of Defendants' conspiracy, Plaintiff and members of the proposed Class suffered serious financial harm. Defendants' conduct had the effect of fixing "bid-ask spreads" at artificially inflated levels. As a result, Plaintiff and the Class paid more for their purchases of SSA bonds, and/or received less for their sales of SSA bonds, in their transactions with Defendants.

## VI.    <u>CLASS ACTION ALLEGATIONS</u>

68.      Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Class"

is defined as:

> All persons or entities who, from January 1, 2011 to December 31,
> 2014, purchased or sold SSA bonds in the "secondary" market in the
> United States or its territories. Excluded from the Class are
> Defendants, their co-conspirators identified herein, and their
> officers, directors, management, employees, current subsidiaries or
> affiliates, and all federal governmental entities.

69.      The Class is so numerous that joinder of all members is impracticable. While the

exact number of Class members is unknown at this time, the Class is believed to number at least

in the hundreds,[19] if not thousands, and to be dispersed throughout the United States.

70.      Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and the members of the Class sustained damages arising out of Defendants' common

unlawful course of conduct. Specifically, Defendants' wrongdoing caused Plaintiff and members

of the Class to pay inflated bond prices when they were buying or receive unduly low bond prices

when they were selling, giving rise to Plaintiff's and the Class's claims for violation of the antitrust

laws.

71.      Plaintiff will fairly and adequately protect the interests of members of the Class.

Plaintiff has retained counsel competent and experienced in class action litigation, including

antitrust class action litigation and specifically litigation of claims alleging manipulation of

financial benchmarks, bid-ask spreads on investments, and other financial and investment fraud

---

[19] George Richardson & Daniel Kim, "Demystifying Supranationals", The World Bank Treasury
&              Jeffries              LLC,              at              17,
www.gioa.us/presentations/2014/2014_World%20Bank_Richardson_Jefferies_Kim.pdf

and wrongdoing.  Plaintiff and its counsel have the necessary financial resources to adequately and vigorously litigate this class action. Further, Plaintiff has no interests adverse to or in conflict with other members of the Class pertaining to the wrongful conduct alleged herein or the relief sought.

72.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize SSA bond bid-ask spreads in interstate commerce in the United States;

b.      The identity of the participants of the conspiracy;

c.      The duration of the conspiracy and the acts performed by Defendants and their co-conspirators in furtherance thereof;

d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.      Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiff and other members of the Class; and

f.      The appropriate measure of damages sustained by Plaintiff and other members of the Class.

73.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

74.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently,

and without duplication of effort and expense that numerous, separate, individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, Class members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

75.     This case presents no special management difficulties that would preclude its maintenance as a class action.

## VII.    EQUITABLE TOLLING DUE TO DEFENDANTS' FRAUDULENT CONCEALMENT

76.     Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct.

77.     At no time did Defendants inform Plaintiff or other members of the Class that they were conspiring to fix or manipulate the bid-ask spreads for SSA bonds. Rather, Defendants took active steps to conceal their conspiracy, including the use of secret modes of communication such as private chat rooms, instant messaging, email, and private in-person meetings. Defendants even went as far as setting up new chat rooms on a daily basis to avoid detection.

78.     Reasonable diligence could not have uncovered Defendants' conspiracy due to the opaque nature of the SSA bond market. The closed, non-exchange-traded nature of the market at issue further obscures what Defendants were doing at any particular time. Further, neither

Defendants' SSA bond trading strategies nor their bid-ask pricing methods are public information. The highly specialized and esoteric nature of the SSA bond market make it extraordinarily difficult for an ordinary person to assess improprieties.

79.      Furthermore, price-fixing conspiracies are inherently self-concealing. Defendants' conduct was designed to, and did, endure over a substantial period of time. Revealing the collusion to customers such as Plaintiff and the Class would have quickly undermined the goals of the conspiracy, as those customers would have taken their business elsewhere and/or reported Defendants to the appropriate regulators. Thus, Defendants' secrecy was necessary to the success of the conspiracy.

80.      As a result of Defendants' active concealment, the opaque nature of the SSA bond marketplace, and the inherently self-concealing nature of antitrust conspiracies, neither Plaintiff nor the proposed Class knew, or could have discovered through reasonable diligence, that Defendants were conspiring to fix the bid-ask spreads for SSA bonds until January 6, 2016, when *International Financing Review*[20] named the specific banks under investigation.

81.      Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class have been tolled during the period of concealment.

## CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE
### SHERMAN ACT, 15 U.S.C. § 1

82.      Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

---

[20] Ramnarayan & Durand, *supra*.

83.     Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  During the Class Period, Defendants entered into an agreement or series of agreements to reduce competition amongst themselves by fixing, maintaining, and/or manipulating the prices of SSA bonds.

84.     This conspiracy to manipulate SSA spreads caused injury to both Plaintiff and the Class by depriving them of the benefit of accurate SSA bond prices reflecting true market conditions, and by causing Plaintiff and the Class to receive, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

85.     The conspiracy among Defendants, horizontal competitors in the secondary market for SSA bond trading services, is a per se violation of Section 1 of the Sherman Act. Alternatively, the conspiracy is an unreasonable restraint of trade that resulted in substantial anticompetitive effects in the SSA bond market. There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

86.     Defendants' conspiracy, and the resulting impact on the prices of SSA bonds, occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

87.     As a direct, intended, foreseeable, and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property.

88.     Plaintiff and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Act alleged herein.

**RELIEF SOUGHT**

89.     Plaintiff, on behalf of itself and the proposed Class, respectfully requests that the Court:

a.      Certify this lawsuit as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), designate Plaintiff as class representative, and appoint Plaintiff's counsel as counsel for the Class;

b.      Adjudge and decree that the unlawful conduct alleged herein violates Section 1 of the Sherman Act;

c.      Find Defendants jointly and severally liable for the damages incurred by Plaintiff and the Class;

d.      Award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

e.      Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

f.      Order other, further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: December 6, 2016                    Respectfully submitted,

                                           /s/ *Robert N. Kaplan*
                                           Robert N. Kaplan
                                           Frederic S. Fox
                                           Donald R. Hall
                                           Matthew P. McCahill
                                           Jason A. Uris
                                           **KAPLAN FOX & KILSHEIMER LLP**
                                           850 Third Avenue, 14th Floor
                                           New York, NY 10022
                                           Telephone: (212) 687-1980
                                           Facsimile: (212) 687-7714
                                           rkaplan@kaplanfox.com
                                           ffox@kaplanfox.com
                                           dhall@kaplanfox.com
                                           mmccahill@kaplanfox.com
                                           juris@kaplanfox.com

                                           *Counsel for Plaintiff City of Riviera Beach Police Officers' Pension Fund*